

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PT:LXN/MMS                                   *271 Cadman Plaza East*
F. #2011R02117                               *Brooklyn, New York 11201*

August 20, 2015

<u>By ECF and Hand</u>

The Honorable Sandra L. Townes
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     United States v. William F. Boyland, Jr.
>         <u>Criminal Docket No. 11-850 (SLT)</u>

Dear Judge Townes:

        The government respectfully submits this letter in advance of the sentencing of the defendant William F. Boyland, Jr., which is scheduled for September 11, 2015.  On March 6, 2014, following a three-week trial, a jury found the defendant guilty of all twenty-one counts in the Third Superseding Indictment: (1) extortion conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951(a) (Counts One, Two, Sixteen and Eighteen); (2) conspiracy to commit bribery and violate the Travel Act, in violation of 18 U.S.C. § 371 (Counts Three and Seventeen); (3) bribery in violation of 18 U.S.C. § 666(a)(1)(B) (Counts Four and Nineteen); (4) honest services fraud conspiracy in violation of 18 U.S.C. § 1349 (Count Five); (5) honest services fraud in violation of 18 U.S.C. § 1343 (Counts Six through Fifteen); (6) theft in violation of 18 U.S.C. § 666(a)(1)(A) (Count Twenty); and (7) mail fraud conspiracy in violation of 18 U.S.C. § 1349 (Count Twenty-One).

        The Presentence Investigation Report ("PSR") calculates a total adjusted offense level of 38 and a criminal history category of I, with a corresponding Guidelines range of imprisonment of 235 to 293 months.  PSR ¶ 100.  The government concurs with the calculation set forth in the PSR.

        The government respectfully submits this letter in opposition to the defendant's letter dated July 17, 2015 ("Def. Ltr."), objecting to the PSR and requesting that "the Court impose…a non-guideline sentence which is substantially below the lower end of the guideline as [the Court] determines it to be."  Def. Ltr. at 11.  For the reasons set forth

The Honorable Sandra L. Townes
August 20, 2015
Page 2

below, the defendant should be sentenced to a term of imprisonment within the advisory
Guidelines range.

I.      Factual Background

        From March 2003 to March 2014, the defendant was an elected member of the
New York State Assembly representing the 55th Assembly District, which covers the Ocean
Hill, Brownsville, Bedford-Stuyvesant, Crown Heights and Bushwick sections of Brooklyn,
New York (the "district" or the "Assembly district").   At trial, the government demonstrated
that the defendant perpetrated four criminal schemes: (1) the Real Estate Scheme (Counts
One through Fifteen); (2) the Carnival Scheme (Counts Sixteen through Nineteen); (3) the
Fraudulent Voucher Scheme (Count Twenty); and (4) the Non-Profit Scheme (Count
Twenty-One) (collectively, the "Criminal Schemes") over multiple years.  PSR ¶¶ 26-41.
The evidence presented at trial showed the wide-ranging scope and brazen nature of the
defendant's greed and fraud.

        A.      The Carnival Scheme

        From August 2010 to August 2011, the defendant, together with others,
including his chief of staff Ry-Ann Hermon, extorted and accepted over $14,000 in bribes in
exchange for undertaking official action to benefit a cooperating witness posing as a carnival
promoter (the "Promoter") and an undercover FBI special agent posing as an out-of-town
businessman ("UC-1").  Specifically, beginning in August 2010, the defendant met the
Promoter and UC-1 on multiple occasions in New York City and discussed the desire of the
Promoter and UC-1 to hold carnivals in the defendant's Assembly district.  At those
meetings, the defendant solicited payments in exchange for assisting the Promoter and UC-1.
PSR ¶ 26.  In connection with this scheme, the defendant indicated that he could accept
illegal payments through non-profit organizations he controlled and through "consultancy
fees."  During one such meeting between the defendant and UC-1 on October 8, 2010, the
defendant stated that he had four non-profit organizations set up through which he could
funnel bribes.  PSR ¶ 27.

        As a result of these meetings, the defendant directed his Assembly staff to
assist the Promoter and UC-1 with their carnival.  The defendant represented to the Promoter
and UC-1 that he and his Assembly staff: (1) engaged in discussions with government
agencies to assist the Promoter in obtaining carnival-related leases and permits; (2) arranged
for a non-profit organization ("Non-Profit A") to sponsor the Promoter's carnivals; and
(3) took steps to ensure that the Promoter would receive letters of support from the defendant
that the Promoter needed to operate carnivals in the Assembly district, and the Promoter did
in fact receive such letters.[1]  PSR ¶ 27.  In exchange, the defendant took over $14,000 in the
form of cash, a check and money orders from UC-1.  PSR ¶  28.

---

        [1]      The government has identified Non-Profit A as a Brooklyn-based non-profit
organization that focused on community economic development.

The Honorable Sandra L. Townes
August 20, 2015
Page 3

     B.    <u>Real Estate Scheme</u>

        From November 2010 to August 2011, the defendant attempted to extort $250,000 and accepted $7,000[2] in cash bribes for undertaking official action to benefit UC-1 and another undercover FBI agent ("UC-2"), who also purported to be an out-of-town businessman pursuing real estate ventures in the Assembly district.  PSR ¶¶ 34, 36.

        On March 11, 2011, the defendant met with UC-1 and UC-2 to discuss their interest in real estate development projects in his district.  Shortly thereafter, the defendant and Hermon solicited money from UC-1, purportedly to pay for lawyers representing the defendant on pending criminal charges he faced in the United States District Court for the Southern District of New York ("SDNY").  In exchange for the money, the defendant offered to use the influence of his office to aid UC-1 and UC-2 in their real estate ventures in his Assembly district.  PSR ¶ 35.

        Specifically, on March 25, 2011, UC-1 met with the defendant and paid him $7,000 in cash, on behalf of himself and UC-2, in exchange for obtaining New York State grant monies to help finance real estate development projects in the defendant's district.  Approximately one week later, the defendant showed UC-1 and UC-2 various locations in his district that he believed would be suitable for real estate development projects.  The defendant emphasized that all the projects were in his Assembly district and that he had control over them.  In a conversation captured on tape, the defendant told the undercover agents, "Everything we've seen I'm in control of.  You know, I'm the politician.  I'm the guy who can make that move over on this end, so we know the folks that can pull the sort of triggers we're looking for."  PSR ¶ 36.

        On April 29, 2011, during a meeting in a hotel room in Atlantic City, the defendant proposed a scheme in which UC-1 and UC-2 would purchase a former hospital in the Assembly district for $8 million, obtain state grant money to renovate the hospital, and resell it for $15 million to a non-profit organization that the defendant said he controlled ("Non-Profit B").[3]  The defendant assured the undercover FBI agents that he would use his influence as an Assemblyman to secure state grant money for the project and handle any zoning issues that arose.  In exchange, as a <u>quid</u> <u>pro</u> <u>quo</u>, the defendant demanded $250,000 in bribes from the agents.  PSR ¶ 37.

        Audio recordings of the April 29, 2011 meeting where the defendant proposed and described the real estate scheme revealed that he recognized that the scheme was corrupt

---

[2]    A portion of the $7,000 bribe was paid in exchange for Boyland's assistance to UC-1 in the carnival scheme.

[3]    The government has identified Non-Profit B as a Brooklyn-based non-profit organization involved in community and real estate development projects.

The Honorable Sandra L. Townes
August 20, 2015
Page 4

and illegal, and that he sought to conceal his own involvement in it.  At the meeting, the defendant stated: "I got a middle guy by the way . . . I gotta stay clean . . . I got a bagman . . ." The defendant further explained that he did not want to talk on the telephone and preferred in-person meetings so that they could discuss openly the illegal scheme without worrying about being overheard or having their calls recorded: "I stopped talking on the phone a while ago . . . I'm just saying there is no real conversation that you can have that, you know, especially with what we're talking about."  PSR ¶ 37.

During another meeting in a hotel room in Manhattan on June 7, 2011, the defendant reiterated that he wanted UC-1 and UC-2 to pay him $250,000 for the hospital development project.  When UC-2 instead offered to pay the defendant $5,000 for introductions to government officials who would be involved in the project, the defendant rejected the offer, stating that his introductions were worth more than $5,000.[4]  PSR ¶ 38.

C.     Fraudulent Voucher Scheme

From January 2007 to December 2011, the defendant stole New York State funds by submitting over 200 false New York State Assembly Member Travel Vouchers ("Vouchers").  The defendant falsely claimed to be in Albany on legislative business when he in fact was not in Albany, including days when the defendant was in North Carolina, Virginia and even Istanbul, Turkey, for personal matters and in New York City meeting with the undercover FBI agents whom he conspired to extort out of $250,000.  In reliance on the defendant's false Vouchers, New York State paid the defendant $71,339.66 in fraudulent mileage expense and per diem payments.  PSR ¶ 40.

D.     Theft of State Funds for the Elderly

From July 2007 to September 2010, the defendant successfully conspired to defraud New York State and the New York State Office of the Aging ("NYSOFA").  The defendant used his position as an Assemblyman to steer New York State funds ("State Funds") to Wayside Outreach Development ("Wayside"), a Brooklyn-based non-profit organization, whose mission, as described on its website, was to provide a "social setting that enable[s] elderly individuals to maintain their independence and remain at home in the community."  However, the defendant then directed that some of those State Funds be used for himself and his political campaigns by paying for community events that promoted him, such as a boat cruise for senior citizens in his district.  In addition, the defendant directed that

---

[4]     Paragraph 38 of the PSR attributes the following quote to Boyland:  "Look, my influence, my ability to get you these people that's worth a lot more than $5,000 or $25,000.  It's worth $250,000."  The government notes that this quote does not appear in any of the recordings that were played at trial or the transcripts that were admitted as exhibits.

The Honorable Sandra L. Townes
August 20, 2015
Page 5

the State Funds be used to pay for goods that promoted the defendant, such as "Team Boyland" t-shirts, which were distributed at some of those community events.  PSR ¶¶ 31-33.

        E.      <u>Defendant's Indictment in the Southern District of New York</u>

On or about March 10, 2011, Boyland was arrested on a complaint in the SDNY for separate and unrelated charges relating to his employment at Brookdale Hospital. At that time he was released on bond, and placed under the supervision of Pretrial Services. Boyland was subsequently indicted on April 7, 2011 and charged with: (1) honest services fraud conspiracy in violation of 18 U.S.C. § 1349; (2) bribery in violation of 18 U.S.C. § 666(a)(2); and (3) Travel Act conspiracy in violation of 18 U.S.C. § 1952(a)(3).  On November 10, 2011, Boyland was acquitted following a trial.  <u>See</u> <u>United States v. Boyland</u>, 11 CR 300 (JSR).

Boyland engaged in the Carnival and Real Estate Schemes at the same time he was facing these criminal charges in the SDNY.  Indeed, Boyland solicited bribes from UC-1 and UC-2, purportedly to pay for lawyers representing Boyland in the SDNY case. Moreover, he submitted false vouchers to New York State on several occasions claiming he was in Albany on legislative business when, in fact, he was in court for the SDNY case.

II.      <u>Sentencing</u>

For the reasons that follow, the Court should sentence the defendant to a term of incarceration within the advisory Guidelines range of 235 to 293 months.

        A.      <u>Legal Standard</u>

Sentencing courts have the authority to fashion a reasonable and appropriate sentence in each case.  In so doing, a sentencing court must consider the Guidelines in formulating such a sentence.  <u>United States v. Booker</u>, 543 U.S. 220, 259-62 (2005). The "Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).  Next, a sentencing judge should consider all of the factors in 18 U.S.C. § 3553(a) to determine the appropriate sentence in each case.  <u>Id.</u> at 49-50.  Those factors include, among other things, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; and to avoid unwarranted disparities between similarly situated defendants.

The Honorable Sandra L. Townes
August 20, 2015
Page 6

    B.    <u>The Applicable Guidelines Range</u>

        As indicated above, the Probation Department has calculated a total offense level of 38, which corresponds to a Guidelines range of 235 to 293 months in Criminal History Category I.  <u>See</u> PSR ¶ 100.  The government concurs with the Probation Department's Guidelines calculation.

        In his sentencing memorandum, the defendant objected to the four-level enhancement "noted in ¶ 61 of the report" as double counting "since the defendant's base offense level already incorporated the fact that he was a public official, to wit, a NYS Assemblyman."  Def. Ltr. at 7.  This enhancement does not constitute "double-counting."  Pursuant to U.S.S.G. § 2C1.1(a)(1), the defendant's base level was calculated at a level 14, as opposed to a level 12, because he was a public official.  PSR ¶ 56.  Paragraph 61 of the PSR imposed a four-level enhancement for the defendant being an organizer or leader, pursuant to U.S.S.G. § 3B1.1(a).  This enhancement is warranted because the defendant was the organizer and leader of the various criminal schemes and directed the actions of others including Ry-Ann Hermon, his father William F. Boyland, Sr., his staff member Michael Caver and James Francis.  This enhancement applies regardless of whether the defendant was a public official and therefore does not constitute impermissible double counting.

        On August 17, 2015, defense counsel notified the government by telephone that he had mistakenly objected to paragraph 61 of the PSR when he had intended to object to paragraph 59 of the PSR, which imposed a four-level enhancement under U.S.S.G. § 2C1.1(b)(3) because Boyland was an elected public official.  According to defense counsel, because Boyland's base offense was at a level 14, rather than level 12, due to Boyland's status as a public official, adding an additional four levels for his being an <u>elected</u> public official is impermissible double-counting.  He is wrong.

        The Second Circuit has recognized that "[i]mpermissible double counting occurs when one part of the [G]uidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the [G]uidelines."  <u>United States v. Watkins</u>, 667 F.3d 254, 261 (2d Cir. 2012) (internal quotation marks and citation omitted).  Here, the four-level enhancement under Section 2C1.1(b)(3) that applies to an <u>elected</u> public official reflects a harm that is not accounted for by the base offense level, which applies to <u>any</u> public official, elected or not.

        Indeed, the Eleventh Circuit  has specifically rejected the argument that Boyland makes here, explaining that "[b]ecause of the critical importance of representative self-government, a guidelines that applies to any public official who betrays the public trust does not 'fully account[]' for the harm that is inflicted when the trust that the official betrays was conferred on him in an election."  <u>United States v. White</u>, 663 F.3d 1207, 1217 (11th Cir. 2011).  The Eleventh Circuit further explained that "[b]eing a bribe-taking 'elected public official' is different from being a run-of-the-mill, bribe-taking, non-elected 'public

The Honorable Sandra L. Townes
August 20, 2015
Page 7

official.'"  Id; see also Amendment 666, U.S.S.G. Appendix C (four-level enhancement for
elected public official expressly contemplated by the Sentencing Commission).  Accordingly,
the application of Section 2C1.1(b)(3)'s four-level enhancement to Boyland's conduct is not
impermissible double-counting because the enhancement reflects a harm not accounted for in
his base offense level.

      The defendant did not object to any other aspect of the Guidelines calculation
in the PSR.

      C.    Forfeiture

      The defendant should be ordered to pay $169,410.14 in forfeiture.  For the
reasons set forth in the government's letter dated February 6, 2015 (Dkt. # 108) at pp. 3-5,
the proposed $169,410.14 forfeiture money judgment amount has been calculated based on
the following ill-gotten gains, as proved at trial: (1) $84,270.48 (Wayside Funds spent on
political events and goods promoting the defendant ); (2) $71,339.66 (Fraudulently Obtained
Voucher Funds); and $13,800 (Bribe Payments Extorted by the defendant).

      This forfeiture money judgment amount is a conservative figure.  Boyland
directed Wayside to falsely state to the NYSOFA in its applications for the State Funds that
all of the State Funds would be used to support Wayside's charitable mission.  The NYSOFA
disbursed the State Funds to Wayside in reliance on that misrepresentation.  Because a
substantial portion of the State Funds were actually used to promote Boyland and fund his
political campaigns, the total amount of State Funds that Boyland steered to Wayside --
$235,000 -- could arguably be included in the forfeiture judgment calculation.  However, the
government is only seeking that Boyland forfeit the portion of the State Funds received by
Wayside that the government proved at trial were actually spent on Boyland's political
events.

      Accordingly, the government respectfully submits that an Order of Forfeiture
holding Boyland liable to pay the amount of $169,410.14 should be entered against him as
part of the Court's sentence.

      D.    Restitution

      Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case.  The
Court must order restitution '"in the full amount of each victim's losses'" without regard to
the defendant's economic circumstances.  United States v. Pescatore, 637 F.3d 128, 138 (2d
Cir. 2011) (citing 18 U.S.C. § 3664(f)(1)(A)).  Accordingly, the government respectfully
requests that the Court order the following restitution: (1) $71,339.66 to the New York State
Department of Taxation and Finance for Boyland's theft of the Voucher Funds; and
(2) $84,270.48 to the NYSOFA for the Wayside Funds spent to promote Boyland.  See PSR
¶¶ 104-105.

The Honorable Sandra L. Townes
August 20, 2015
Page 8


      E.      <u>Section 3553(a) Analysis</u>

      For the reasons below, a consideration of the sentencing factors set forth in Title 18, United States Code, Section 3553(a) supports imposition of a term of incarceration within the advisory Guidelines range.

      1.      <u>History and Characteristics of the Defendant</u>

      The defendant's history and characteristics favor a sentence within the Guidelines range.  <u>See</u> 18 U.S.C. § 3553(a)(1).

      The defendant was raised by his parents under "middle-income conditions" in the Bedford-Stuyvesant section of Brooklyn and comes from a prominent political family. PSR ¶ 75.  His father and uncle were long-serving New York State Assemblymen and his sister served as a New York City Councilwoman.  Def. Ltr. at 1.  Indeed, the defendant describes how his family's influence in certain Brooklyn communities was "so significant that the family has been dubbed the '"Kennedys of Brownsville."'  <u>Id.</u>  Unlike many other offenders who appear before the Court, the defendant had the benefit of a stable family and support system.  He was not forced into a criminal life due to the circumstances surrounding his upbringing.  Indeed, the defendant's ex-wife told Probation that when she first met the defendant he was "'down to earth and humble'" but that '"the job'" changed him and he '"developed a level of arrogance.'"  PSR ¶ 77.  Indeed, the audiotapes played at trial repeatedly demonstrated Boyland's arrogance and hubris.  For example, in one conversation captured on tape, the defendant told the undercover agents, during a drive through his district, that, "Everything we've seen I'm in control of.  You know, I'm the politician.  I'm the guy who can make that move over on this end, so we know the folks that can pull the sort of triggers we're looking for."  PSR ¶ 36.

      In his sentencing submission, the defendant describes at length his accomplishments as an Assemblyman, including how he "work[ed] tirelessly as a member of five standing committees," was the prime sponsor of at least 128 bills, organized and participated in a march against domestic violence and conducted town hall meetings once a month.  Def. Ltr. at 4-6.  He also cites to letters of support he received from members of his community.  Def. Ltr. at 10.  However, it was the defendant's job as an elected public official to serve his constituents and help improve their lives.  He should not receive any special credit for simply doing the job for which he was elected.  <u>See</u> <u>United States v. Serafini</u>, 233 F.3d 758, 773 (3rd Cir. 2000) ("[I]f a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants."); <u>see</u> <u>also</u> <u>United States v. Vrdolyak</u>, 593 F.3d 676, 683 (7th Cir. 2010) (holding that a district court erred in giving weight to letters attesting to defendant alderman's good deeds in part because "[p]oliticians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of

The Honorable Sandra L. Townes
August 20, 2015
Page 9

gratitude by beneficiaries of politicians' largesse should not weigh in sentencing"); U.S.S.G. § 5H1.11 (public service "not ordinarily relevant in determining whether a departure is warranted").

      In <u>United States v. Ganim</u>, the Court imposed a 108 month sentence on the former mayor of Bridgeport, Connecticut following his convictions for racketeering, bribery and other offenses relating to his acceptance of hundreds of thousands of dollars in cash payments and gifts.  2006 WL 1210984 at *1, 4 (D. Conn. 2006).  In fashioning the defendant's sentence, the sentencing court considered the defendant's accomplishments as mayor but stated that "it should be given a lesser weight in the context of a top elected municipal official who criminally and shamelessly flout[ed] his lawful authority and the public trust."  <u>Id.</u> at * 3.  The Court further stated:

> As an elected official, [the defendant] had a duty to serve the public.  In the sentencing equation, he is entitled to no special credit for his work on behalf of the city, because that is what he was elected and paid to do.  This is not a situation where the defendant's service to the community is entirely separate from his position and therefore could be considered exemplary—for example, an embezzling corporate CEO who feeds the elderly at a nursing home or volunteers at the public library.  Rather Ganim's service to the community of Bridgeport was exactly what was expected of him as mayor, and when being sentenced for corrupting that office it is of less import whether the city under his administration made progress toward civic goals.

<u>Id.</u>  The <u>Ganim</u> Court's rationale applies to this case as well.  Boyland was paid a salary of $79,500 to serve his constituents by, among other things, sponsoring bills and speaking out against domestic violence.  However, that $79,500 was not enough for Boyland.  As he told UC-1, while they were dining at a steakhouse in Manhattan, "I mean, we make $79.5 as Assembly members …What the hell, that's maybe my son's tuition, and maybe I can pay for some gas, you know? ... How the hell are you gonna live off of that?"  Gov't. Ex. R-308; Gov't. Ex. T-308.  Contrary to the opinion he expressed through those statements, Boyland was not entitled to abuse his office merely because he was dissatisfied with the salary associated with the prestigious office he had sought.

      In any event, any of the defendant's accomplishments as an Assemblyman are far outweighed by his longstanding abuse of that office and his brazen efforts to sell the power and influence of that office.

      2.    <u>Nature and Circumstances of the Offense</u>

      The nature and circumstances of the offense also warrant a Guidelines sentence in this case.  <u>See</u> 18 U.S.C. 3553(a)(1).  The evidence at trial demonstrated how the

The Honorable Sandra L. Townes
August 20, 2015
Page 10

defendant sold the power and influence of his office and inflicted serious harm on the democratic process.  Boyland engaged in several multi-faceted criminal schemes which spanned many years.  He blatantly solicited over $250,000 in bribes and stole money that was directed to the elderly residents of his community.  Boyland represented some of the poorest and most disadvantaged residents in the city.  He took advantage of those residents and inflicted tremendous damage on his community by placing his own financial interests above theirs.  The evidence at trial also demonstrated the defendant's greed and sense of entitlement when he submitted over 200 false vouchers to New York State.

In addition to the crimes the government proved beyond a reasonable doubt at trial, the Court heard evidence regarding Boyland's regular improper use of campaign funds.  From April 2008 to November 2009, Boyland withdrew, and instructed Hermon to withdraw, thousands of dollars from his campaign accounts to pay for personal expenses such as yoga classes, his cable bill and personal vehicle.  See PSR ¶¶ 42-43.

Finally, Boyland flagrantly and unabashedly committed crimes while on pre-trial release in both the SDNY and this Court.  In fact, Boyland committed the majority of the crimes of conviction while on pre-trial release in SDNY.  It is shocking that Boyland did not hesitate even a second to solicit a $250,000 bribe while under indictment in the SDNY for, among other things, bribery.  It is also equally shocking that while under indictment in the SDNY, Boyland submitted fraudulent per diem vouchers to New York State that falsely stated he was in Albany on official business, when, in fact, he was meeting with the undercover FBI agents in New York City, and was appearing in court in the SDNY on his criminal case there.  See Tr. dated March 25, 2014 at 3-4; PSR ¶ 40.

Moreover, Boyland continued to commit crimes every day while on trial in this district, which further demonstrates his lack of respect for the law.  As the Court has already found, Boyland drove to trial every day on a suspended license in a vehicle with a suspended registration (notably with New York State Assembly license plates affixed to his vehicle).  If that conduct wasn't offensive enough, the defendant also attempted to tamper with a government witness by anonymously contacting her via text message after she testified at trial.  See Tr. dated March 25, 2014 at 3-4.

In sum, the scope of the defendant's arrogance and the breadth of his criminal conduct is staggering.  The evidence at trial proved that the defendant committed crimes and engaged in misconduct almost every day during the time period while under investigation by the FBI, while under indictment in the SDNY and this district, and only concluded upon his conviction in this case when the Court remanded him into custody.  Accordingly, the nature and circumstances of the offense clearly calls for a sentence within the applicable Guidelines range.

The Honorable Sandra L. Townes
August 20, 2015
Page 11

      3.      Need to Promote Respect for the Law, Provide
              Just Punishment and Afford Adequate Deterrence

      The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct" also all weigh in favor of a Guidelines sentence.  18 U.S.C. § 3553(a)(2).

      Sadly, New York State has experienced numerous highly publicized corruption scandals in the last few years.  This has led to a decline in public confidence in our elected officials, a harm that cannot easily be measured.  However, the conviction and subsequent incarceration of numerous public officials in recent years did not deter Boyland from engaging in a myriad of criminal acts.  Indeed, as discussed above, Boyland committed many of the instant offenses despite being under criminal indictment in the SDNY.  He even continued to commit crimes during his trial by attempting to tamper with a government witness and driving to court on a suspended license in a vehicle with a suspended registration.  Simply put, the defendant, a former lawmaker, is an individual who lacks any respect for the law.  Therefore, a Guidelines sentence is necessary to deter him from committing additional crimes and inflicting further damage to the community at large.

      A Guidelines sentence is also necessary to deter current and future public officials and their employees from engaging in corrupt acts.  A Guidelines sentence for a corrupt elected official who violated the public trust, abused the power of his office and solicited bribes while under criminal indictment in another district, will send an important message of deterrence, that the risk of punishment is not worth the crime.  See e.g., Stephanos Bibas, White-Collar Plea Bargaining & Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005) ("[W]hite-collar crime is more rational, cool, and calculated than sudden crimes of passion or opportunity, so it should be a prime candidate for general deterrence.  An economist would argue that if one increased the expected cost of white-collar crime by raising the expected penalty, white-collar crime would be unprofitable and would thus cease."); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment").

      As one district court noted:

      We need not resign ourselves to the fact that corruption exists in government.  Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or

The Honorable Sandra L. Townes
August 20, 2015
Page 12

experiences.   Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.   It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all-not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp.2d 923, 940, (N.D. Ill. 2006), aff'd 477 F.3d 517 (7th Cir. 2006).

The defendant must be held accountable for the full measure of his crimes. A substantial sentence will send a strong message that public corruption will not be tolerated, and if discovered, the punishment will be just, appropriate and severe.

4.      The Need to Avoid Unwarranted Sentencing Disparities

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

In his sentencing letter, Boyland cites ten cases in which sentences were imposed in other "political corruption cases prosecuted in the past seven years" that are far lower than the Guidelines range here.  Def. Ltr. at 8-9.   However, the relevant facts and circumstances of those cases differ significantly from this case.  In particular, Boyland's survey is unconvincing because it lacks a careful comparison of offense conduct, does not contain the actual Guidelines ranges applicable in those cases, and does not discuss all facts relevant to the Section 3553(a) factors contained in the PSRs and presented to the various sentencing courts in those cases.  No valid comparison of sentences can be made without such information.  Courts have observed that simply comparing a defendant's sentence to that imposed in other cases is weak evidence.  See e.g., United States v. Saez, 444 F.3d 15, 19 (1st Cir. 2006).  Such comparisons "opens the door to endless rummaging by lawyers through sentences in other cases, each side finding random examples to support a higher or lower sentence, as their clients' interests dictate."  Id.

A cursory look at the examples of the relatively lower sentences cited by Boyland demonstrates the flawed logic of his argument.  Each of the defendants Boyland cited in his sentencing memorandum will be addressed below.

Efrain Gonzalez, Shirley Huntley and Carl Kruger

Unlike the defendant who exercised his right to go to trial, was convicted of 21 felony counts, and still has declined to accept responsibility for his conduct, Gonzalez, Huntley, and Kruger accepted responsibility for their crimes and pleaded guilty.  Moreover,

The Honorable Sandra L. Townes
August 20, 2015
Page 13

the advisory Guidelines ranges for these defendants were substantially less than the one applicable to Boyland.  The following chart lists the advisory Guidelines ranges for Gonzalez, Huntley and Kruger and the sentence imposed by the Court:

| Defendant | Case No. | Advisory Guidelines Range[5] | Sentence Imposed |
|---|---|---|---|
| Efrain Gonzalez, Jr. | 06 CR 726 (WHP) (S.D.N.Y.) | 108 to 135 months[6] | 84 months |
| Shirley Huntley | 13 CR 54 (JBW) | 18 to 24 months | One year and one day |
| Carl Kruger | 11 CR 300 (JSR) (S.D.N.Y.) | 108 to 135 months | 84 months |

By comparison, Boyland's advisory Guidelines range is 235 to 293 months.  Accordingly, the Gonzalez, Huntley and Kruger cases are not sufficiently analogous to even warrant a comparison to Boyland.

Brian McLaughlin

Brian McLaughlin, another example cited by Boyland to support his argument that a Guidelines sentence would be unwarranted, not only pleaded guilty, but also cooperated with the government and received a 5K1.1 letter, which reflected the "substantial assistance" he provided to the government.  Therefore, McLaughlin's case is inapposite.  Moreover, it should be noted that the sentencing judge imposed a sentence of 120 months' imprisonment on McLaughlin, notwithstanding the government's motion for a downward departure pursuant to section 5K1.1 in recognition of McLaughlin's substantial assistance.

Specifically, Judge Sullivan explained in sentencing McLaughlin, "I think general deterrence is crucial here with a public official, someone who held high office, who was respected and admired, who had access to the types of people who had written letters, generously, but nevertheless powerful people who can write articulate and thoughtful letters.  You had every opportunity, and you used those opportunities and squandered them for your own benefit on a monumental scale."  United States v. McLaughlin, 06 CR 965 (RJS) (S.D.N.Y.) Tr. dated May 20, 2009 at 43.

---

[5]     The Advisory Guidelines ranges are available through various filings on PACER.

[6]     The government notes that Judge Pauley denied Gonzalez a two-level reduction for acceptance of responsibility in light of Gonzalez's motion to withdraw his guilty plea and the assertions he made in support thereof.  With acceptance of responsibility, Gonzalez's Guidelines range would have been 87 to 108 months.

The Honorable Sandra L. Townes
August 20, 2015
Page 14

Accordingly, McLaughlin was not similarly situated to Boyland for various reasons, the least of which is that McLaughlin cooperated with the government and Boyland did not. See United States v. Fearon–Hales, 224 Fed.Appx. 109, 114 (2d Cir. 2007) (finding that disparate sentences are not unwarranted when other defendants had pled guilty and cooperated with the government and defendant had not); United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) (explaining that different sentences among co-defendants were reasonable and readily apparent where co-defendants cooperated and defendant did not); see also James v. United States, 603 F. Supp.2d 472, 481-82 (E.D.N.Y. 2009) (finding that petitioner's lawyer had no basis to request downward departure based on sentencing disparity because co-defendants had cooperated with government and defendant had not).

<u>Diane Gordon and Alan Hevesi</u>

Diane Gordon and Alan Hevesi's cases are also similarly distinguishable because, among other things, they were prosecuted in the state system and were convicted of crimes that were different from the ones for which Boyland was convicted.  Section 3553(a)(6) refers to unwarranted disparities among federally-charged defendants and therefore consideration of sentences imposed in those state cases would be improper.  See e.g., United States v. v. Haynes, 985 F.2d 65, 70 (2d  Cir. 1993) ("[T]he sentencing guidelines were adopted by Congress to achieve uniformity in federal sentencing for similarly situated defendants") (emphasis added); see also United States v. Tejada, 146 F.3d 84, 87 (2d Cir. 1998) (stating that Congress's purpose in enacting sentencing guidelines was "eliminating disparity on a national level"); United States v. Wiseman, 749 F.3d 1191, 1196 (10th Cir. 2014) (federal-state sentencing disparities are not relevant under 3553(a)(6)).  Accordingly, Boyland's reliance on Gordon and Hevesi's cases is improper because Section 3553(a)(6) was intended to reduce unwarranted disparities between federal defendants, not federal defendants and state defendants.

<u>Pedro Espada, Larry Seabrook, Malcolm Smith and Eric Stevenson</u>

Pedro Espada, Larry Seabrook, Malcolm Smith and Eric Stevenson were elected officials convicted at trial.  However, they are also not similarly situated to Boyland because, among other things, their advisory Guidelines ranges were simply not as high as that of Boyland, which reflects the difference between the gravity of their crimes and the gravity of Boyland's crimes.   The following chart lists the Guidelines ranges for Espada, Seabrook, Smith and Stevenson and the respective sentences imposed by the Court:

| Defendant | Case No. | Advisory Guidelines Range | Sentence Imposed |
| --- | --- | --- | --- |
| Pedro Espada, Jr. | 10 CR 985 (FB) | 70 to 87 months | 60 months |
| Larry Seabrook | 10 CR 87 (DAB) (S.D.N.Y.) | 70 to 87 months | 60 months |

The Honorable Sandra L. Townes
August 20, 2015
Page 15

| Malcolm Smith | 13 CR 297 (KMK) (S.D.N.Y.) | 97 to 121 months | 84 months |
|---|---|---|---|
| Eric Stevenson | 13 CR 161 (LAP) (S.D.N.Y.) | 51 to 63 months | 36 months |

Notably, Espada, Seabrook, Smith and Stevenson were all sentenced only slightly below their advisory Guidelines ranges.  However, it is also notable that none of those defendants faced an advisory Guidelines range of 235 to 293 months.  Therefore, Boyland is not similarly situated to any of those defendants.

In sum, because Boyland did not cooperate with the government or accept responsibility for his criminal actions, was convicted of 21 felony counts after a federal trial and faces an advisory Guidelines range of 235 to 293 months, Boyland has failed to show that he is similarly situated to any of the defendants cited in his sentencing memorandum such that any disparity between his sentence and theirs would be "completely unjustified and warranted."  Def. Ltr. at 8.

III.     Conclusion

For the foregoing reasons, the government respectfully submits that the Court should sentence the defendant to a term of incarceration within the applicable advisory Sentencing Guidelines range of 235 to 293 months.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney

By:     /s/Marisa Megur Seifan
Marisa Megur Seifan
Lan Nguyen
Assistant U.S. Attorneys

cc:     Defense Counsel (by ECF)
Clerk of the Court (SLT) (by ECF)
Michael Dorra, Senior U.S. Probation Officer (by e-mail)